UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA

                         CRIMINAL NO. 20-20382

vs.                          HON. PAUL D. BORMAN

DENNIS WILLIAMS,

    Defendant.

_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

Dennis Williams tried to live two lives. On the one hand, at public events, he excoriated the things that were "wrong in the United States of America" because union members "cannot buy the things they build." (Dennis Williams's 2015 SBC Speech). But in private, he exploited the hundreds of thousands of UAW members that he led. Eventually though, this double life caught up to him. As the UAW criminal investigation unwound, an ugly truth emerged. The highest-level officials, including then President Dennis Williams, embezzled thousands of dollars of hard-earned union funds on lavish, personal entertainment. The reverberations of these actions will last years, if not decades. The seriousness of the offense, in other words, should not be understated. Indeed, largely because of this egregious conduct, the government urges the Court to impose a within-guideline, 24-month sentence and a significant fine.

1

## BACKGROUND

The UAW (or, by its official name, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America) is "one of the largest and most diverse unions in North America." It has more than 400,000 active members, and more than 580,000 retirees. These members work (or have worked) in a range of companies, including the "Big Three" auto manufacturers.

The UAW constitution lays out the organization's objects, structure, officers, and framework. *See generally* UAW Constitution, *available at* https://uaw.org/wp-content/uploads/2019/01/2018-UAW-Constitution.pdf. As explained in this document, the UAW is led by the officers on its executive board—the International Executive Board or IEB. The IEB is made up of a President, Secretary-Treasurer, three Vice Presidents, and the Regional Directors. (The UAW has different geographical regions, each led by its Regional Director.)

This constitution also contains an "Ethical Practices Codes." *Id.*, p.133. Under this code, the UAW's funds "are held in sacred trust for the benefit of the membership." *Id.*, p.136. It also emphasizes that officers and representatives shall not "accept 'kickbacks,' under-the-table payments, valuable gifts, lavish entertainment or any personal payment of any kind." *Id.*, p.137.

Between 2001 and June 2010, Dennis Williams, himself, was an institution within the ranks of the IEB. Between 2001 and June 2010, he served as the UAW

Regional Director of UAW Region 4, which covers parts of the Midwest and Northwestern United States. Then in 2010, Williams was elected to be the UAW Secretary-Treasurer. And from 2014 to 2018, he served as the UAW president, the union's top official. (PSR, ¶¶ 10, 73). For all these elections—indeed, for every election that Williams "won" from 1983 to 2014—he ran unopposed. In other words, Williams' rise to power came through inside political dealing and dissuading competition, rather than through the vote of the UAW membership.

While Williams was UAW president, federal agents began investigating various schemes and illegal activities occurring by the top members at UAW and some of the Big Three auto manufacturers. Eventually, investigators uncovered numerous criminal violations.

1.  **Williams and other top UAW officials enjoy "lavish" villas, meals, golf and other extravagant expenses on the backs of union workers.**

One embezzlement scheme involved UAW officials hiding illegitimate expenses in reimbursement requests from union conferences. For instance, every January, UAW Region 5 held its annual conference in Palm Springs, California. The conference lasted between three to five days, depending on the year. Ostensibly, the Region 5 Conference was to train local union leadership on issues that affect them, such as bargaining, grievance adjudication, and the proper administration of the union. But the top-level officials, including Williams, treated it like an all-expenses-paid vacation. While the conference had occurred for some

3

time, the level of spending increased dramatically during Williams's tenure as UAW President—it became "out of control." (Ex. 1: Report of Retired UAW Official Interview on 3/5/19, p.2).

Williams attended this Palm Springs conference, but other than a brief opening day speech, he had little involvement in any legitimate conference activities. Yet he would stay in his luxurious villa much longer than the conference's duration. In 2014, for instance, the conference lasted three days— from January 14th to the 16th. But Williams stayed in his villa for an entire month, from December 27, 2013 to January 27, 2014.

For subsequent years, Williams lengthened his stays. In fact, Vance Pearson, then the Assistant Director of Region 5, received a phone call from Williams in July 2014 about the length of his Palm Springs stays. (Ex. 2: Report of Pearson Interview on 12/9/19, p.10). In that call, Williams explained that he would stay in Palm Springs for one month his first year in office, two months the second, three months the third, and four months for the fourth. (*Id.*). So, Pearson followed this directive. At the 2015 conference, which was during his first year as UAW president, Williams stayed in Palm Springs for 37 days. Then he stayed 105 days in 2016, 121 days in 2017, and 71 days in 2018. Williams also invited guests, who stayed in their own villas. And the cost was substantial. For the 2017 conference, for example, the UAW paid $20,000, just for Williams's accommodations.

4

Williams, his guests, and other top-level UAW officials racked up substantial bills at golf courses, restaurants, and other venues before, during, and after the conferences. For instance, before the 2017 conference began, at a New Year's Eve event on December 31, 2016, the group spent over $6,500 at LG's Prime Steakhouse. The bill included thousands of dollars of liquor, wine, and four bottles of champagne (that alone cost $1,760), a specific request by Williams's wife. (Ex. 3: Report of Jones Interview on 1/17/20, p.5).

These high-level officials also spent extravagantly on golf. For the Palm Springs conferences between 2015 and 2018, they incurred over $80,000 at the Indian Canyons Golf Resort for green fees, merchandise and other expenses. For another Region 5 conference in Coronado, California during these same years, they spent over $70,000 for green fees at numerous golf resorts and retail purchases at pro shops. Some of these officials, including Dennis Williams, also received sets of custom-fit golf clubs at yet another resort in Lake of the Ozarks, Missouri.

In addition to the villas, exorbitant restaurant bills, and unending golf, Williams and these top UAW officials also went on excursions, stocked their villas with expensive wine and liquor, and obtained over $60,000 in cigars and related paraphernalia, like humidors.

Of course, these "lavish" expenses were problematic in-and-of-themselves. But to compound the problem, they were hidden from the UAW's accounting

5

department. The UAW used a "Direct Bill" or "Master Account" arrangement with the hotels. So senior UAW officials could run a tab for various expenses, like the restaurant and golf course bills described above. The hotel would pay these third-party vendors. And they would include these "outside" expenses in their overall bill to the union. But the brief hotel summaries only generically described (and sometimes falsely described) what the charges were for. There were, of course, separate itemized bills describing the detailed expenses—like horseback rides on the beach, $1,760 bottles of champagne purchased outside the conference period, or $60,000 of cigars and related items. But these were buried, never submitted to the UAW accounting staff reviewing the reimbursement or "voucher" request.

Gary Jones and Vance Pearson (as the Region 5 Director and Assistant Director) sent these vouchers with the hotel's Master Bill of Palm Springs expenses to the UAW accounting department. But Jones explained that this system did not begin with him. (Ex. 3: Report of Jones Interview on 1/17/20, p.2). Jones's predecessor at Region 5, Jim Wells, and his friend Dennis Williams, then the Director of Region 4, were "fond of union travel to Palm Springs." (*Id.*). And they were hesitant to curb the union's spending there. So Williams advocated using the Master Account system (that they eventually implemented), which would conceal their "extracurricular activity." (*Id.*, p.3).

**2. Williams knows, or at least has reason to know, that the out-of-control expenses were paid for with UAW funds.**

Williams has not admitted that he knew these "extracurricular activit[ies]" were paid for with UAW funds, e.g., from the Regional Activity Fund. Rather, he says, he "intentionally chose not to determine the origin of the funds used to pay for the items, despite having suspicions about them." (ECF No. 7, PageID.24). And "[i]n certain instances," he "believed that items . . . were paid for with 'flower fund' money . . . ." (*Id.*).

But others disagree. One retired UAW official—who was Williams's friend and guest in Palm Springs—told Williams that he was concerned they were going to "get in a jam" over the Palm Springs expenses. (Ex. 1: Report of Retired UAW Official Interview on 3/5/19, p.3). In response, Williams told him that the UAW had a "Regional Activity Fund." (*Id.*).

Vance Pearson recounted a similar conversation with Williams. He said that Williams told him that Regional Activity Funds can be used for anything, leaving Pearson with the impression that Williams understood that these "extracurricular activit[ies]" were paid out of this account. (Ex. 2: Report of Pearson Interview on 12/9/19, p.6).

Jones also said he talked with Williams about the payments. Jones explained that he and Williams discussed the fact that the conference expenses were paid for with "Regional Activity Funds." (Ex. 3: Report of Jones Interview on 1/17/20,

7

p.6). In fact, according to Jones, Williams was "instrumental" in the scheme because he implemented a policy change that gave sufficient funding to allow for the extravagant conferences. (*Id.*). The policy put 30% of UAW's property sales in the Regional Activity Fund of the region where the property was located. (*Id.*). So by selling property, Region 5 was able to accrue a "healthy" amount in their fund—more than sufficient to cover the lavish Palm Springs expenditures. (*Id.*).

Both Jones and the retired UAW official explained that, given the size of "flower fund" accounts contrasted with the enormous Palm Springs's expenses, it was not plausible that Williams could have believed conference expenses were paid with officials' flower funds. (Ex. 3: Report of Jones Interview on 1/17/20, p.6; Ex. 1: Report of Retired UAW Official Interview on 3/5/19, p.3).

Indeed, as the criminal investigation "was heating up," Williams suggested that his friend, the retired UAW official, use a certain "story." Williams told him to say that, at times, the retired official was staying with him and "other times [he] was staying with" the retired official. (Ex. 1: Report of Retired UAW Official Interview on 3/5/19, p.5). But the retired official "pushed back" and explained he had no intention of lying for Williams. (*Id.*).

3.  **Williams takes advantage of training center funds by helping grow "chargebacks" to inappropriate amounts, and using training center monies for personal lunches and lavish celebrations.**

Together with the "Big Three," the UAW operated joint training centers. For example, the UAW and Fiat Chrysler operated the UAW-Chrysler Skill Development & Training Program d/b/a the UAW-Chrysler National Training Center (the "NTC").

UAW would "assign" officials to work at the NTC and the other training centers, then receive a "chargeback" from the car companies, e.g., for the "assigned" official's salary and fringe benefits. (2:20-cv-13293, ECF No. 1, PageID.19-20). This was no small sum. Indeed, between 2003 and 2019, UAW received over $300 million from these "chargebacks." (*Id.*). But many of these "chargebacks" were improper, e.g., because the UAW employee was working less than full time at the training center, or sometimes not at all. (2:20-cv-13293, ECF No. 1, PageID.20).

While he was UAW president, Williams pushed his leadership team to use training center funds, instead of using UAW funds, to pay for its employees. (Ex. 3: Report of Jones Interview on 1/17/20, p.8; Ex. 4: Report of Interview on 4/15/19, p.9, *filed under seal*). In fact, Williams told them that he "did not care who was put on" as an assigned worker, so long as "the training center pays." (Ex. 3: Report of Jones Interview on 1/17/20, p.9).

9

He operated in a similar way with training center credit cards—ordering people who had such a card to come have lunch with him at the London Chop House, and to "bring [your] card." (Ex. 4: Report of Interview on 4/15/19, p.10, *filed under seal*). But in public, he put on a different face. In 2017, for instance, after criminal charges against individuals who abused training center funds, Williams sent a letter to UAW members, stressing that he was "appalled" by the charged conduct that included "misuse of [training center] credit cards and the provision of unlawful or unethical personal benefits."

Williams spoke in an equally forceful tone during his speech at the 2018 UAW Constitutional Convention. (Ex. 5: 2018 Convention Speech). He exclaimed that "those who misallocated or misused training center funds betrayed our trust." (*Id.*, p.107). Importantly, he also claimed that he and his "leadership team had no knowledge of the misconduct . . . until . . . brought to our attention by the government." (*Id.*).

But years earlier, in July 2015, Williams was present at an event to kick off UAW's negotiations for the collective bargaining agreement. Not surprisingly, it was at the London Chop House, Williams's favorite restaurant in Detroit. And even though it had nothing to do with the training center—indeed, no Fiat Chrysler executives were even present—the more-than-$7,500 bill was paid for with NTC funds. And a few months after that, in September 2015, NTC funds were again

10

used for a lavish event at the London Chop House. Williams and his UAW negotiating team spent almost $7,000 celebrating a collective bargaining agreement with Fiat Chrysler (that was eventually rejected by the UAW membership). Again, this had nothing to do with the NTC.

4. **Williams's Black Lake "Cabin"**

UAW owns and operates a 1,000 acre resort and conference center, often referred to simply as "Black Lake" and which the union considers "a living tribute to the lives of Walter and May Reuther." UAW began a tradition of building a cabin on Black Lake for each retired president. So too with Williams. Indeed, some expenditure was nominally approved for Williams by a vote at the June 2018 UAW Convention and by an earlier IEB vote, where Williams "recused" himself. But the costs to construct this lavish "Cabin" continued to grow. Williams oversaw the design. And most importantly, he accepted this lavish, million-dollar lakefront "Cabin"—which was, of course, paid for on the backs of the rank-and-file workers he was supposed to have led—for his *personal* benefit.

5. **Williams pleads guilty to conspiring to embezzle union funds.**

Jones and Pearson agreed to cooperate. The government continued to build its case. And Williams eventually agreed to plead guilty. (PSR, ¶ 3: ECF No. 7, PageID.19). With a negotiated plea agreement, Williams pleaded guilty to conspiring to embezzle union funds. (ECF No. 7, PageID.20).

11

Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the plea agreement contains a "cap" of 24 months. (ECF No. 7, PageID.27). But there was no agreement as to a fine, which can be as much as $250,000. (ECF No. 7, PageID.19, 28). Williams has paid $56,114 to the UAW and agreed to pay the remainder of the Court-ordered restitution amount. (ECF No. 7, PageID.28-29). He also agreed to pay $15,459 to the Internal Revenue Service related to unpaid taxes connected with the offense. (ECF No. 7, PageID.32).

The government recommends that the Court impose a 24-month custodial sentence, a period of supervised release, and a substantial fine.

## SENTENCING FACTORS

**A.     The Guidelines—the "lodestar" in sentencing.**

As anyone who's practiced federal criminal law in the post-*Booker* world knows, the sentencing guidelines are no longer mandatory. That's not to say that they're irrelevant. Indeed, the guidelines are the "starting point" and "initial benchmark" for determining an appropriate sentence. *United States v. Demma*, 948 F.3d 722, 727 (6th Cir. 2020) (quoting *United States v. Bistline*, 665 F.3d 758, 761 (6th Cir. 2012) and *Gall v. United States*, 552 U.S. 38, 49 (2007)). Put differently, the guidelines are the "lodestar" in the sentencing process. *Molina-Marinez v. United States*, 136 S.Ct. 1338, 1346 (2016).

The parties' and the probation department calculated the Total Offense Level as 15 based on the following:

```
Base Offense Level (USSG §2B1.1(a)(2))                        6
Loss amount b/t $95,000-$150,000 (USSG §2B1.1(b)(1))         +8
Abuse of position of trust (USSG §3B1.3)                     +2
Leader/organizer (USSG §3B1.1)                               +2
Acceptance of Responsibility (USSG §3E1.1)                   -3
                                                             15
```

(ECF No. 7, PageID.38, 45; PSR, ¶¶ 30-40). Williams is within Criminal History Category I. (*Id.*, ¶ 43). So his sentencing guideline range is 18-24 months. (*Id.*, ¶ 79).

It is important to note that the loss amount here is based on the amount of funds that Williams *himself* enjoyed—the costs of his own villas, the villas for his guests, his green fees, golf clubs, a portion of the cigars and restaurant bills, etc. In contrast, Edward Robinson's, Gary Jones's and Vance Pearson's loss amounts were based on the amounts that *everyone* enjoyed from the vouchers they submitted. Robinson had resort employees create false information for the vouchers submitted to UAW headquarters. And Jones and Pearson signed and submitted the fraudulent vouchers to the UAW accounting department. Williams didn't. As UAW President, Williams signed the checks that were given to the hotels as payment. And he approved the yearly LM-2 reports. But because he did not create or submit the fraudulent vouchers or specifically approve these individual bills, the guidelines were calculated differently.

13

But his 18-24 month guideline range is nonetheless significant. Given the gravity of Williams's conduct, there is no reason to depart downward. Indeed, because of his role, a 24-month sentence is necessary.

**B.      The serious conduct warrants a serious punishment**

Williams's actions and inactions substantially harmed UAW members, retirees, and the union itself. He smoked, drank, and golfed away hard-earned dues money. But the damage was greater than this.

For the four years William served as President, he was the face of the UAW. That position gave him power, influence, and a platform.



14

He told his fellow union members that "CEOs and board members and Wall Street" "didn't have a problem getting theirs" so "we" should "not feel bad about getting ours." (Dennis Williams's 2015 Detroit Labor Fest Speech). But he was corrupted by the power. Williams ignored his responsibility to act on behalf of the hard-working men and women of the UAW. The "we" that he helped "get[ ] theirs" were the top-level officials, including himself.

But of course, the harm is greater than the financial loss. Williams has cast a stain on the UAW. He undermined the trust that the UAW had built up—with its members, with union workers, and even with the general public. Current and future UAW members will carry this burden for years to come—a burden that Dennis Williams has laid at their feet.

**C. The sentence must be sufficient to deter others.**

Williams is retired, financially well off, and in his late 60s. He is not, in other words, likely to commit another serious embezzlement crime like this one. But "[s]entences influence behavior." *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010) (*quoting United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007)). And the sentence here should be sufficient to deter others.

Millions of Americans are members of labor unions. They look to and depend on their leadership to act zealously, in the best interests of the

15

membership. Future leaders must understand that substantial abuses of this trust—especially ones by the senior most leaders—will be severely punished. This conduct cannot stand. And the sentence should reflect this.

**D.     A sentence within the guidelines will help avoid disparities.**

This Court has already sentenced Robinson and other defendants who misused training center funds. Importantly, though, 18 U.S.C. § 3553(a)(6) "concerns national disparities" and not "disparities between one defendant and another." *Untied States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018) (citation omitted). In any case, the sentencing guidelines help courts avoid disparities of similarly-situated defendants. In other words, "[t]he Guidelines exist to help ensure that similarly-situated defendants are punished similarly." *United States v. Vassar*, 346 Fed.Appx. 17, 29 (6th Cir. 2009) (citing *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006)). And disparities are at their "ebb" for sentences within the guideline range. *Boscarino*, 437 F.3d at 638. In contrast, the "more out-of-range" the sentence, "the more disparity there will be." *Id.*

## CONCLUSION

Based on all the § 3553(a) factors, as discussed above, the Court should impose a 24-month sentence.

Respectfully submitted,

SAIMA S. MOHSIN
Acting United States Attorney

| | |
|---|---|
| *s/Steven P. Cares* | *s/David A. Gardey* (w/ consent) |
| STEVEN P. CARES | DAVID A. GARDEY |
| Assistant U.S. Attorney | Assistant U.S. Attorney |
| 211 W. Fort Street, Suite 2001 | 211 W. Fort Street, Suite 2001 |
| Detroit, MI 48226 | Detroit, MI 48226 |
| steven.cares@usdoj.gov | david.gardey@usdoj.gov |
| (313) 226-9139 | (313) 226-9591 |

**CERTIFICATION OF SERVICE**

I hereby certify that on **May 3, 2021**, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all attorneys of record.

s/Steven P. Cares (P68503)
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan  48226
Phone:  (313) 226-9139
E-mail: steven.cares@usdoj.gov